25-1706 Southern Iowa, Choreo v. Kevin Lors, et al. Please be seated, Mr. Van Orn. Good morning, Your Honors. May it please the Court. The District Court in this case took the extraordinary and drastic step of entering a preliminary injunction. It should not have done that. It should have waited to resolve the merits of this case on a full record and remedied any harms it found with damages. The many prongs of this injunction fail for a variety of reasons, but the one that cuts across all of them is lack of irreparable harm. So that's where I'm going to start. I'll also address the unenforceability of the No Services Covenant as applied to financial advisors who work with clients who choose them without solicitation and anything else Your Honors want to address. But let me start with irreparable harm. This Court has repeatedly held recently that lack of irreparable harm is a basis for reversing a preliminary injunction. It did it in Wild Hawk. It did it in H&R Block. It did it in Bieber. And in this case, the central failing is that all of the harm is uniquely reparable with money damages. There was discussion of goodwill, reputation. Those are the two words that come to mind. I know there wasn't a hearing here, but what's the record say about that to the extent that that could be carved out from monetary damages? You put your finger on it, Your Honor. The entirety of the record on that is two paragraphs and two affidavits. One is at separate appendix, so Corio's appendix, page 42. The other is the separate appendix, page 195. Mr. Bartlett, this is what he said. He cites the loss of goodwill with clients that Corio has spent time and money developing. And then he cites the destabilization of Corio's business by undermining the notion that Corio's clients are clients of the company. That's it. That's literally it, Your Honor. They had two people say two things like that. The two cases most directly on point from this court on things like that in the record are the MPAY case that we cite and then the management registry case that we cite. In both of those, they involved loss of clients, too, and the court found that's not irreparable harm because it's reparable. It's measurable. And then the person, the party seeking the injunction, also had generalized statements about goodwill like this, and the court found they weren't sufficient. And the reason goes back just to the nature of preliminary injunctive relief being extraordinary and drastic. The standard in this court coming from the Supreme Court is that anything of harm has to be certain. And so the problem with the goodwill-based harm here is it's not certain. It's conclusory. It could be certain or non-conclusory. Could there be some kind of testimony or evidence that the nature of the exit and the taking of the clients, I don't know whether it's reputation or goodwill, but somehow put out to the community that this company was not a good company, nobody should go there, they're not good service providers. Is there anything like that that could have been materialized in the record? Well, there certainly are cases in which goodwill is a valid basis. And the ones that we typically see are when there's internal strategy by an executive or something like that and they leave. So like the PepsiCo when they're fighting over Gatorade. How about the Medtronic cases? Which Medtronic cases, Your Honor? The pacemaker salesman who's in the operating room, Dresden Greens, at the time of the implant. Yes, Your Honor. And therefore is a very valuable employee to buy for a new competitor. Yes, so value, Your Honor, is monetary and can be recovered with money. I know, those cases, Medtronic has obtained injunctions in at least three jurisdictions I'm aware of. Yes, what I'm saying, Your Honor, is in that case the distinction, I think, on that in terms of reputable versus irreparable is when you're selling devices and the whole concept is you don't know how many devices you're going to sell on that. That has triggered what the courts did. But those cases originated with the rural milk deliverers cases from the late 19th century in Minnesota. So, Your Honor, irreparable harm is a federal issue, not a state issue on that. It's controlled in this. They've been followed. Now, wait a minute. It is, Your Honor, you may have in mind, Your Honor wrote a decision a long time ago in safety clean that relied on state law for that. I'm relying on research I did for both a lawyer and in that case. This court's controlling case is an NBank decision. It's modern computer systems, 871 Fed Second, 734. The pen site is 737 footnote 5. In an NBank ruling in a diversity case, the court said that federal law controls the irreparable harm standard. Of course it does. Okay. That's not an issue. So here what I'm saying, Your Honor, here is that this court's recent cases have all said that when there's measurable clients and measurable profits, that's not irreparable harm. It's reputable harm. And it's reversed repeatedly like that. And here in this financial services industry, it is measurable to an unusual degree. Corio has put in the number of clients, the number of assets under management. It's even put in here the amount of revenue from it. These are only one-year non-competes. And distinguishing the Medtronic cases, Your Honor. Well, the issue is quite different between brokers and financial advisors. Well, Your Honor, I don't think the facts are materially different, but there are different federal regulations. And that's certainly true. The case law on irreparable harm that we're talking about, which has morphed somewhat over the years, but not that much. It is changing, Your Honor. And let me tell you why this is different in terms of measurability than Medtronic. Because the covenants here are limited. They only apply to clients that were there. So there isn't any possibility of unknown clients on that. They don't fall within the scope of the covenants. And so because of that, you can measure precisely. You're talking about compensation for specific clients. I'm talking about the loss of goodwill to the enterprise when a branch is destroyed. And let me address that, Your Honor. So that's the uncertainty. This is where Judge Kelly started. This record, this particular record, is literally two sentences that are mirror images talking about the destabilization of the concept that clients belong to Corio. That's it. There isn't any more proof here, Your Honor. And under this Court's cases, that's not enough for that. The real harm here, and to go to the loss of an office, Your Honor, this Court actually looked at that fact in the CDI energy case coming out of North Dakota as cutting against an injunction. Because that's past. That can't be stopped. No, this is future. This all happened within a few days. There wasn't a past. No, Your Honor. This is what happened in CDI. They lost eight out of nine local employees. Right, and an injunction can't fix that, Your Honor. An injunction can only prevent future changes. And so the future changes here are clients. That's not right. It is right. It's a matter of Article 3 standing, Your Honor. Whether they were able to replace those departed people depends a lot on whether the departed people can continue serving their established client relationship. Oh, that's not an argument of irreparable harm that is made in this record, Your Honor. The arguments on irreparable harm are going to clients. And the point here, Your Honor, is that under this Court's cases, all of that is measurable. All of it is compensable with damages. What happened to that Des Moines office? As I understand it, you could make an argument that if it completely decimated this particular office, the Des Moines office, that could be irreparable harm. Your Honor, as far as this record shows, there was one employee left. But employees from elsewhere at Corio are serving the clients that remain. So you look at the big Corio, not this Des Moines branch? That's what this Court did in CDI Energy, and it makes sense. Because it's truly irreparable if a business is no longer there, like they can't fight back. But Corio is still there. It's not going anywhere. It had $27 billion under management and lost about 1.5% of that. So it's a lot of money. The revenue at issue here, according to Corio's records here, is maybe like $7.5 million revenue a year, which is a big number for people, but it's not going to take down Corio. So that's not irreparable harm. It's harm. It's significant. But it's measurable, and therefore it's money. And that's why I want to pivot here, Your Honor. It's not measurable. You're saying it's insignificant. No, it's measurable. This is assets under management, and they charge a percentage of that, Your Honor. It's exactly known. They've already measured it. They measured it in this Court. They put an affidavit on this. Let's see here. I'll pull it up. I'll have it for you on rebuttal. But they already numbered it, Your Honor, so it can be repaired. And that is the trend, Your Honor, and that's why I want to go to the no-service covenant under Minnesota law in the prediction there. And on this, Minnesota law is clear. It's a balancing test. It's reasonableness test. That's established by the Supreme Court. And the question here is, would the Minnesota Supreme Court enforce this kind of covenant in the situation where departing financial services advisors who had relationships with clients don't solicit them, but the clients choose them on their own? Would the Minnesota Supreme Court say, you can bar that and join it? How do you tease that? I think that's a good question. I'm trying to figure out how to tease that out from the non-solicitation because that's a factual dispute here. And so if you don't, and let's say if an injunction is proper on the non-solicitation, how do you tease that out as a practical matter? Maybe I'm putting the cart before the horse here. No, I think Your Honor is right that it's tied up together. On that point, I think the district court made a legal error. There aren't any Minnesota Supreme Court cases on what solicitation or not is, but the closest one on point is from the District of Minnesota. It's the UBS Financial Services by Judge Davis, and he drew the line as you can reach out, you can tell people where you're going, you can tell your left, you don't have to hide, you don't have to fall off the face of the earth. But if you do that and the clients come to you, that's not solicitation. And we've cited a bunch of cases there. Well, let's just assume that that's just still up in the air. There's a factual dispute, right? Like the parties disagree on whether that was solicitation or not. And I guess I'm just trying to figure out if that still remains in dispute, how do you then resolve the non-service provision, which I think is more difficult because Minnesota hasn't addressed that particular type of... Yeah, I think what you would do, Your Honor, is you would put it into the overall four-factor balancing, and you would say, you know, is there such a low likelihood of success here that you're just wiped out? I'd argue yes, but Your Honor could say it's unclear, but at least it's low. And when you put that low prospect of enforceability together with a lack of irreparable harm, where you come up is you don't do it in a preliminary injunction where the record is undeveloped. You wait until you do it later and you remedy it with damages. Because all we're here on is this extraordinary remedy, and that remedy should be reversed. I see I'm down to little time, so I'll reserve the rest. Thank you. Thank you. Mr. Weinstein. Good morning, Your Honors, and may it please the Court. My name is Alex Weinstein. I represent Corio of the appellee in this case, joined by my colleague, Allison Cerniak. After a substantial briefing and the submission of documentary and written testimonial evidence, the Court exercised its broad discretion to enter the injunction that's on appeal today. The District Court not only followed the law, but the facts that were entered into the record, and also imposed an injunction that is entirely consistent with the contracts at issue in this case. I understand the Court's reviewed our briefing and the record. I do not want to regurgitate that today. You've got to speak up for me. I don't want to regurgitate what the record already says, but I would like to address a few points raised in argument today, as well as irreparable harm in the public interest. So starting with irreparable harm, the defendants argue two parts of irreparable harm. First, they argue that Corio has failed entirely to make a showing of irreparable harm. And then separately, they argue a more nuanced, there's no irreparable harm for the clients who moved over before the injunction was entered, even if there might be irreparable harm for the clients who could move over in the future. Starting with just irreparable harm, my colleague on the other side discussed that the record is barren of any evidence of irreparable harm. We disagree with that. Yes, there are written testimonial affidavits from Gregory Dollar and Craig Bartlett, no doubt about that. But there is also substantial documentary and other testimonial evidence in the record that talks about the relationships that exist, how Corio has developed these relationships, in some cases over decades, and the value of those relationships to Corio beyond monetary calculation. As Judge Kelly, as you pointed out, there is harm to goodwill that goes beyond what possible monetary calculation... Can you just succinctly articulate what does the record say about the harm to goodwill? Yes. So, Your Honor, so losing these clients, permanently losing these clients, would deprive Corio not just of the revenues that they may generate each year, which we don't think is readily calculable. We really don't. But it would also deprive Corio of the future growth of those relationships, which often, as the record reflects, result in referrals from other clients and expansions of additional relationships through the addition of family members. And that wouldn't be recoverable monetarily? It would not be subject to easy calculation or in any way calculable in a way that was easily obtainable, as the case law on irreparable harm suggests. Were there declarations that say this, what you're saying right now, that it's referrals, it's difficult to calculate kind of benefits down the road? I believe there were. I believe it was Gregory Dollar's declaration and Craig Bartlett's declaration. Mr. Bartlett, I believe, had three declarations before the preliminary injunction hearing was issued, and he definitely speaks about the fact that these relationships morph into referrals, and that's also, I believe, referenced in their briefing as well. But there's also a broader irreparable harm that Your Honor touched on as well, which is the destabilization of Corio. The morphed referrals, is that some kind of consequential damage claim that exists then as a result of this misconduct, alleged misconduct? And where does that not end? When does it become so remote that it's not causally connected to the breach? I mean, it's always impossible to say, well, this might have morphed into 47 other referrals, right? I mean, you know, and to say that's an element to damages and therefore it's not incalculable, or therefore it is incalculable, and so we're entitled to this extraordinary injunctive relief, I mean, wouldn't that be present in every single case like this? I mean, all you've got to do is say, hey, I get other referrals, I don't know how many of those will be, and it's going to be hard to know because we won't have access to all their records, but if they had stayed here and worked for us, then we'd know what they were, and we are losing that money. And couldn't you just say that every single time? You might be. It obviously depends on the facts and circumstances of each case, because not every relationship does result in referrals or an expansion through the close-built relationships that are developed uniquely in this industry. But to your question, we view the referrals and that possibility of expansion, including expansion through additional family members that are added, as part of the goodwill that's being lost. Okay. Those clients going to bat for Corio, those clients selling Corio to others within the community, that is goodwill. That is also harmed reputation by the mass exodus of not just the four lead advisors, but very soon after, an additional eight of the nine remaining employees in that office. It truly did decimate Corio's Des Moines office, which was its largest revenue office in the company. How do you measure reputation? We actually believe it's immeasurable. I'm sorry? We believe it's immeasurable, which is why it is. Or how do you assess it? How do you describe it? How do you convince the district court that your reputation is at risk? I think what the district court relied upon in reaching that conclusion was the idea that in the very public realm, which started with a press release issued by the defendants, there was a very public mass exodus of an entire office of Corio. That harms its reputation in the public sphere, followed by a mass exodus of the clients, which was also published. They described in this press release that it was a $1.2 billion office that was taken. That was what? That was taken. Taken? From Corio, yes. There was a press release where Compound says, we took some value of business from Corio? It was not what they had already taken at that point, but that they acquired a $1.2 billion office. I'm trying to remember the exact words. Did they say that? I thought the exact words were something like, we previously had under management $1.2 billion. In the article itself. The title of the article was not as parsed out as that. In the article itself, it referred to the clients that they serviced previously having $1.2 billion in assets under management. That's correct, Judge Erickson. That's a little different than saying, hey, we took the $1.2 billion office and moved it. That's fair. And at that point in time, the clients had not officially left yet. They started leaving very shortly thereafter. And it was a very fast-paced move after that. There were 114 clients that were lost in a matter of days. This question maybe is a little weird, but as a person who used to preside over jury trials and manage cases and manage injunctions I set out there floating on the face of the earth, I have a real question about that the injunction, as it's applied to clients who have already left Corio, how that no-service section of the preliminary injunction can be applied to these people that have already moved their assets and are over here living with Brand X, and now you say, well, Brand X can't manage these guys, and now they've got, you know, what, $1.2 billion that are sitting over here that nobody can manage it? I mean, it's not simply, you know, I mean, I just don't know how that's a workable thing, right? I get where prospectively you could say that there should be injunctive relief, that you can't manage anyone who moves after point A, but once they're already there and they've moved their assets and they're sitting there, you're imposing a harm, a tangible real harm on the investors. And if I can address that, Judge Anderson. Yeah. So there are kind of two points here. The first is the court did not bar compound from servicing these clients. It barred the individual defendants from servicing these clients. You keep mumbling. I'm sorry. Did not define what? My apologies, Judge Loken. The court did not bar compound from servicing these clients. It only barred the individual defendants from servicing these clients, and while it's not part of the record in practice, many of these clients are being serviced by different advisors at compound. And this concern, Judge Erickson, that you raised was addressed head-on in another case, also involved in Corio. It was known by R.S.M. Magladry at that point in time called the Carpita case, and it was a 2012 case where this argument was raised and this issue that you're referring to, Judge Erickson, came up under the public interest element of things. And what Judge Jarvie recognized there was that there are a myriad of financial advisors within the Des Moines area and the Cedar Rapids area in that case, and that the clients would receive quality of service regardless of who was servicing them. And so we believe that Judge Rose actually approached the injunction correctly to mitigate potential harm to the clients by allowing compound to continue servicing them, but also recognizing Corio's protectable interests and stopping the individual defendants from servicing them. And the second point in response to your question, Judge Erickson, is that this Court has long held that the proper status quo when entering an injunction is the last peaceable status quo. It's the last uncontested status quo. And what Judge Rose did in entering the injunction was place the parties in the last uncontested status quo before the controversy arose. That is justifiable under this Court's precedent, and it also ensures that injunctive relief has the purpose that it's intended to serve. And I want to respond, Judge Loken, to one of the points you raised about the relationships with these clients and the value and how that extends beyond just the monetary component of the relationship. And in the safety clean case that was referenced earlier, Your Honor recognized that customers, or employees, build very close relationships with customers. They are the face of the company to these customers. And because of that, there is an interest in preventing prior employees from capitalizing on the relationships that they built on behalf of the company through a new employer. And it's especially acute in this case, because in this case, these individual defendants, it is undisputed, came to Corio with no clients. Every client they serviced was either assigned to them as an existing client at Corio or developed while they were being paid a salary and had bonus potential and used Corio's resources to develop these relationships on Corio's behalf. That goodwill, which defendants claim they own, is well established under Minnesota law, with the seminal case being Granger v. Craven, to belong to the employer. So are you – we've got goodwill kind of in a couple places. Are you talking about irreparable harm now, or are you talking about taking the position that the no-service provision is enforceable under Minnesota law? It would be both, Judge Kelly. Actually, I think we already talked about goodwill with respect to irreparable harm. With respect to the allegation that the non-service provision is unenforceable for public policy reasons, which is the only challenge that has ever been made to these covenants before the district court. No challenge of reasonableness, no challenge of length, no challenge of predictable interest before the district court. All that's ever been argued is public policy, and we do not believe there's any support in Minnesota law for the argument that these types of provisions are unenforceable as a matter of public policy. And the district court asked counsel during the preliminary injunction hearing, do you have a case that supports your argument that these covenants are unsupported as a matter of public policy under Minnesota law? And the answer was no. So even when a former client comes and says, I want to move with no – let's just – for purposes of this question, there's no issue of solicitation. They walk up and they want the business. You think Minnesota would say that's fine, so long as there are other limitations? Like, yep, you can prohibit that relationship even if it is initiated by the potential client. We do believe that Minnesota would say that that is fine because there's also the protection of the confidential information and trade secrets that were developed and known by these individuals throughout the relationship with these clients. That's different, though, isn't it, taking the information and saying, you know, you can't rely on the information that you developed when you were at Corio is different than saying you can't service a client who comes up to you voluntarily without any solicitation. It assumes that there's the ability to service these clients without relying on that information, which we believe is not the case, and so did the district court. That the client wouldn't be able to come with their own information? Potentially, but not all of the information. So some of the information naturally does come from the clients, but not all of it does. There are impressions that are made on that information that are then used to put plans into action for those clients. That information is not publicly available, and it's not something that an advisor can just take out of their head. But to your question, Judge Kelly, there is no evidence in this case, none, that any clients voluntarily approached the individual defendants. Their own declarations make clear they went on a campaign to contact clients immediately after leaving Corio. They reached out to them. So to the extent Minnesota may take issue with a case where a client on their own comes... Well, it's okay to, the Minnesota law says you can say, I'm moving from place A to place B, notify the client. Is that what you're talking about, the reach out by the advisors to their clients or the people they're servicing? We don't actually believe that Minnesota case law does support the fact that you can even do a targeted outreach. Certainly, you can make a generalized announcement, but a targeted outreach... And I apologize, I see my time's expired. Can I finish answering your question? Targeted outreach, there are multiple cases cited in our briefs. The Hays Group case, the Fung v. Riemenschnauer, where a dear friend's letter, simply saying, hey, I have moved, after the departure from an employer, was found to be solicitation, even though it simply said, I've left and here's my new contact information. The Hays Group case, the court really, it's a Minnesota state court case, really dug into what constitutes solicitation, relied upon the First Circuit Court of Appeals and their discussion, in which they said the idea that who reaches out first means that all bets are off after that outreach is not consistent with the law and was not consistent with the law in Minnesota, because the closer knit these relationships are, the less initial outreach actually matters when determining if there is solicitation. And so with that, we would ask that the court affirm. May I ask a question, Judge? You know, at one point you cited Granger v. Craven, and I took you to be arguing essentially that that's a seminal case that sort of explains the duties and presumptions and the burdens of proof that are necessary in order to sustain the injunctive relief. It's 101 years old, and there's been a lot of change in this sort of business relationship law as it's developed. Do any of those changes impact the sort of reliance that we can or should give to it? And I do know that the Minnesota Supreme Court keeps citing Granger as a seminal case, so it's not something that's been called into serious question by the Minnesota Supreme Court. But I'm just a little leery about it at some level, and I'd just like to ask you to address it. No, and Judge Erickson, it's a fair question. It's a question that I asked while we were briefing. The preliminary injunction was, should we be relying on this case? But everywhere we looked, it was constantly cited by Minnesota courts and by parties in their briefing on issues as recently as today. There's nothing to suggest that it's not good law, and we're not citing it for every proposition in the case because parts of that case don't apply. It was a non-compete case. This is not a non-compete case. But with respect to where Goodwill, sorry, who Goodwill belongs to, that is, in fact, still good law, and it was reiterated, including in Lapidus v. Lurie, a more recent case that we rely upon, that I believe also relied upon the Granger case in its findings. Thank you. Thank you, Your Honors. We appreciate your time. For rebuttal, I'll give him two minutes. Thank you, Your Honor. The law of this court is, quote, is not an irreparable injury so long as the losses can be recovered. That's wild hawk. That's the binding law of this court. It was applied in this context by Judge Schultz most closely in some of the financial advisor cases. So all of the losses of clients, which Corio specifically quantified at separate Appendix 194, the past ones, the future ones, all of that does not support an irreparable injury, which takes us to Goodwill. In this case, on this record, Corio has not identified any Goodwill separate from the clients, which is measurable. The restrictive covenants here don't apply to people they didn't work with. So any generalized notion of Goodwill is something Corio didn't even contract for. And, in fact, when they say that they're concerned about Goodwill from all the employees leaving, here's what they said in their employee handbook. You are free to end your employment with Corio at any time. That's in the record of this case, separate Appendix 86. So they can't point to a loss of Goodwill from people leaving because people were free to leave. They have to tie the Goodwill harm to something that went wrong. And that's where we get into now the drastic and extraordinary remedy of an injunction. Your Honors have pointed a couple of things here that the law is, is that just reaching out and saying, I'm going, is not a violation under Minnesota law. Your Honor, Judge Erickson has pointed out the CDI energy case, and counsel has conceded, compound can represent the people who left. So in joining the advisors from representing them doesn't do Corio any good. It doesn't make the clients go back. All it does is hurt the clients who left and hurt the advisors by prohibiting the people who want to work together from working together. Your Honor pointed out that the thinness of the information that's confidential here, there's nothing here that's equivalent to a broader trade secret, a secret method of investing anything. The confidential information is about the humans, and the humans own that information. That's why the trend of the cases is saying when the human who leaves says, I want to keep working with it, the company can't say, I'm sorry, no, I own the information about you. That person has a choice. For all these reasons, the injunction should be reversed here. There's a lot to go on developing a full record and other arguments, but the injunction should be reversed. Thank you, Your Honors. Thank you, Counsel. These are not easy issues. They've been well briefed and argued, and we'll take them under advisement.